UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

NOV 01 2010

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MATT JOHNSON; et al.,

          Plaintiffs,

and

KEVIN CHAVEZ; et al.,

          Plaintiffs - Appellants,

   v.

RANCHO SANTIAGO COMMUNITY COLLEGE DISTRICT and THE LOS ANGELES AND ORANGE COUNTIES BUILDING AND CONSTRUCTION TRADES COUNCIL,

          Defendants - Appellees,

and

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS UNION LOCAL 441, ELECTRICAL APPRENTICESHIP PROGRAM,

          Defendant.

No. 08-56963

D.C. No. 8:04-cv-00280-JVS-MLG
U.S. District Court for Central California, Santa Ana

**MANDATE**

RECEIVED
CLERK, U.S. DISTRICT COURT

NOV - 1 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

The judgment of this Court, entered October 08, 2010, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

Molly C. Dwyer
Clerk of Court

Gabriela Van Allen
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

MATT JOHNSON; MICHAEL SPIERING;
JAMES BIRMINGHAM,
                          *Plaintiffs,*

                and

KEVIN CHAVEZ; JOSEPH NIGBOR;
TRAVIS BARRETT; WES BERTALAN;
ASSOCIATED BUILDERS AND
CONTRACTORS OF SAN DIEGO, INC.
ELECTRICAL UNILATERAL
APPRENTICESHIP COMMITTEE;
SOUTHERN CALIFORNIA
CHAPTER OF THE ASSOCIATED
BUILDERS AND CONTRACTORS, INC.
ELECTRICAL UNILATERAL
APPRENTICESHIP COMMITTEE,
                *Plaintiffs-Appellants,*

                 v.

RANCHO SANTIAGO COMMUNITY
COLLEGE DISTRICT; THE LOS
ANGELES AND ORANGE COUNTIES
BUILDING AND CONSTRUCTION
TRADES COUNCIL,
                *Defendants-Appellees,*

                and

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS UNION LOCAL
441, ELECTRICAL APPRENTICESHIP
PROGRAM,
                          *Defendant.*

No. 08-56963
D.C. No.
8:04-cv-00280-JVS-
MLG
OPINION

16967

16968  JOHNSON v. RANCHO SANTIAGO COMMUNITY COLLEGE

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
May 4, 2010—Pasadena, California

Filed October 8, 2010

Before: Betty B. Fletcher and Richard A. Paez,
Circuit Judges, and Donald E. Walter, District Judge.*

Opinion by Judge Paez

_____

*The Honorable Donald E. Walter, Senior United States District Judge
for the Western District of Louisiana, sitting by designation.

## COUNSEL

Carole M. Ross and Richard M. Freeman (argued), Sheppard, Mullin Richter & Hampton LLP, San Diego, California, for plaintiffs-appellants Kevin Chavez; Joseph Nigbor; Travis Barrett; Wes Bertalan; Associated Builders and Contractors of San Diego, Inc., Electrical Unilateral Apprenticeship Committee; and Southern California Chapter of the Associated Builders and Contractors, Inc., Electrical Unilateral Apprenticeship Committee.

Ray Van der Nat (argued), Los Angeles, California, for defendant-appellee Los Angeles and Orange Counties Building and Construction Trades Council and Glenn S. Goldby and Gregory A. Wille (argued), Declues, Burkett & Thompson LLP, Huntington Beach, California, for defendant-appellee Rancho Santiago Community College District.

## OPINION

PAEZ, Circuit Judge:

In 2003, Rancho Santiago Community College District ("the District") entered into a project labor agreement with the Los Angeles and Orange Counties Building and Construction Trades Council ("the Council") and its affiliated construction unions that governed labor relations for many District construction projects over a three-to-five-year period. The agreement required, among other things, that contractors use union "hiring halls" to obtain workers, that all workers on covered

projects become union members within seven days of their employment, and that all contractors and subcontractors working on covered projects agree to the project labor agreement and to the master labor agreement negotiated by the union for each craft. Seven individual non-union apprentices and two non-union apprenticeship committees filed suit challenging the agreement as preempted by the National Labor Relations Act ("NLRA") and the Employee Retirement Income Security Act ("ERISA") and as violative of their rights to substantive and procedural due process and to equal protection. The district court granted the defendants summary judgment on all claims.

Reviewing de novo, we hold that entering into the agreement constitutes market participation not subject to preemption by the NLRA or ERISA, and that the agreement did not violate the plaintiffs' rights to substantive or procedural due process or to equal protection. As a preliminary matter, we also reject the District's mootness and Eleventh Amendment sovereign immunity defenses. Specifically, we conclude that this appeal falls within the "capable of repetition, yet evading review" exception to mootness, and that the District waived any sovereign immunity defense by failing to pursue it while extensively litigating this suit on the merits. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2002, voters in the Rancho Santiago Community College District approved Ballot Measure E, which authorized the District to issue $337 million in general obligation bonds to fund improvements to the District's facilities. After voters approved the Measure, unions that had supported the Measure E campaign encouraged the District to enter into a project labor agreement,[1] which would govern labor conditions for

---

[1] A project labor agreement is a pre-hire agreement between a construction project owner and a union or unions that a contractor must agree to

the subsequent construction. The District agreed and entered into a "Project Stabilization Agreement" ("PSA" or "the Agreement") with the Council and affiliated craft unions. Before entering into the Agreement, the District did not conduct any formal studies to determine its costs and benefits, but the District's Board of Directors heard testimony from many people in the community. According to the District's former construction manager, Robert Brown, the Board heard estimates that the PSA could increase costs by zero to thirty percent.

The PSA that the District ultimately executed covered all of the District's construction projects funded with Measure E funds that cost over $200,000. The Agreement applied to all covered projects initiated in a three-year period and would remain in effect for two additional years if neither party terminated it. According to the District, the PSA applied to twenty-seven projects, but the plaintiffs contend that these twenty-seven projects actually represent twenty-seven categories covering many more discrete projects.

Among other things, the PSA made the signatory unions the exclusive bargaining agents for all employees; established dispute-resolution mechanisms; required use of union "hiring halls" to obtain workers; required all workers on covered projects to start paying union dues within seven days of their employment; and prohibited strikes, picketing, and other disruptions. The Agreement further required all contractors and subcontractors working on a covered project to agree to the PSA and to the craft unions' master labor agreements, which required contractors to use the unions' apprenticeship pro-

---

before accepting work on the project and that establishes the terms and conditions of employment for the project. 51 Corpus Juris Secundum, Labor Relations § 311. Such agreements are common in the construction industry, where the short-term nature of employment impedes post-hire collective bargaining, and where contractors need predictable costs and a steady supply of skilled labor. *Id.*

grams and to contribute to union vacation, pension, and health plans. Finally, the PSA established a Work Opportunities Program that required the unions to establish an apprenticeship program for District residents, to encourage the referral and utilization of District residents as workers on covered projects, and to maximize opportunities for minority- and women-owned businesses.

In response to the District's approval of the PSA, seven individual apprentices not affiliated with a union ("the individual apprentices" or "the named apprentices") and two non-union apprenticeship committees (collectively, "the plaintiffs") filed suit in March 2004 against the District, the Council, and the International Brotherhood of Electrical Workers Union 441's Electrical Apprenticeship Program ("Local 441") (collectively, "the defendants") in the federal district court for the Central District of California. The suit challenged the PSA on the grounds that it violated various state laws, that it was preempted by ERISA and the NLRA, and that it violated the named apprentices' rights to substantive and procedural due process and to equal protection as guaranteed by the U.S. Constitution. The original complaint sought declaratory and injunctive relief and attorney's fees and costs.

On the defendants' motion, the district court dismissed the state law claims against all defendants and dismissed all but the NLRA preemption claim against Local 441. The parties later agreed to dismiss Local 441 completely.

The defendants later moved for summary judgment on the merits or, in the alternative, partial summary judgment against five of the named apprentices whose claims were allegedly moot because they had graduated from their apprenticeship programs. In response, the plaintiffs amended their complaint to include a request for nominal damages to prevent the graduated apprentices' claims from becoming moot. Three of the named apprentices, however, agreed to dismiss all of their claims from the action.

The district court held that the prayer for nominal damages prevented the graduated apprentices' due process and equal protection claims from becoming moot, but granted the defendants' motion for summary judgment on those claims. After additional briefing, the district court also granted the defendants summary judgment on the ERISA and NLRA preemption claims, concluding that the PSA was exempt from preemption because it constituted state market participation, not regulation. The plaintiffs appealed.

## II.  JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's grant of summary judgment. *Mortimer v. Baca*, 594 F.3d 714, 721 (9th Cir. 2010). Summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In deciding whether to affirm the grant of summary judgment, we must determine whether, "viewing the evidence in the light most favorable to the nonmoving party, . . . there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Mortimer*, 594 F.3d at 721 (internal quotations and citation omitted).

## III.  DISCUSSION

Before reaching the merits of the plaintiffs' claims, we must first address the defendants' contentions that this appeal is moot and that the District is entitled to sovereign immunity.

### A.  Mootness

The District contends that this appeal is moot because the PSA has expired and the District is not likely to enter into a

new PSA, and because all the named apprentices have graduated. In general, a case is moot if there is no longer any "present controversy as to which effective relief can be granted." *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007) (internal quotations and citation omitted). A case is not moot, however, if the challenged action is "capable of repetition, yet evading review." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002). We conclude that the plaintiffs' challenge to the PSA falls within this exception to mootness.

As an initial matter, we note that the plaintiffs' prayer for nominal damages for their substantive due process, procedural due process, and equal protection claims prevents those claims from becoming moot.[2] *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002) ("A live claim for nominal damages will prevent dismissal for mootness."). We therefore need only consider whether the expiration of the PSA or the graduation of the named apprentices renders moot the ERISA and NLRA preemption claims for injunctive and declaratory relief.

---

[2]The District contends that our decision in *Seven Words LLC v. Network Solutions*, 260 F.3d 1089 (9th Cir. 2001), prevents the prayer for nominal damages from saving the constitutional claims from mootness because the plaintiffs did not amend their complaint to request those damages until *after* the District moved to dismiss based on mootness. The District reads *Seven Words* too expansively. In *Seven Words*, we dismissed the plaintiff's appeal as moot where the plaintiff "never sought damages . . . (until a few days before argument in [the appeals] court)," "never [made] an effort to amend the complaint to include a damages claim," and had "effectively disavowed damages for tactical reasons." *Id.* at 1095, 1097. Here, by contrast, the plaintiffs amended their complaint to include a request for damages and never made any tactical decision not to request damages. Their failure to seek nominal damages in their original complaint therefore does not preclude the nominal damages request from preserving a live controversy over their constitutional claims.

### 1. Expiration of the PSA

**[1]** Despite the expiration of the PSA, we conclude that this appeal is not moot because the challenged conduct is "capable of repetition yet evading review." The "capable of repetition, yet evading review" exception to mootness applies "only where '(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again.' " *Biodiversity Legal Found.*, 309 F.3d at 1173 (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir. 1993)). The challenged PSA satisfies both of these criteria.

**[2]** First, the duration of the challenged PSA was "too short" to permit full litigation. The duration of a challenged action is "too short" where it is "almost certain to run its course before either this court or the Supreme Court can give the case full consideration." *Id.* The PSA had a term of three years, but remained in force for two additional years because neither party exercised its right to terminate it after the first three years. For purposes of determining whether the PSA's duration was so short as to evade review, we consider only the Agreement's mandatory three-year term. We have applied "the evading-review doctrine where the 'duration of the controversy is solely within the control of the defendant.' " *Anderson v. Evans*, 371 F.3d 475, 479 (9th Cir. 2004) (quoting *Biodiversity Legal Found.*, 309 F.3d at 1174). Similarly, here, because the PSA's extension for an additional two years was solely within the District's control, we will apply the evading-review doctrine if the duration *not* within its sole control—three years—would be too short to allow for full judicial review.

**[3]** We have acknowledged that three years is generally too short to allow a case "seeking a declaratory judgment regarding the legality of [an agreement's] provisions [to] proceed beyond district court review." *Int'l Ass'n of Machinists &*

*Aerospace Workers, Local Lodge 964 v. B.F. Goodrich Aerospace Aerostructures Grp.*, 387 F.3d 1046, 1050 (9th Cir. 2004). Indeed, the course of this litigation demonstrates that three years is too short for us or the Supreme Court to give the case full consideration; it has already been pending for nearly six and a half years. Even without counting the three years in which the district court stayed the case pending Ninth Circuit and Supreme Court decisions, this litigation has taken over three years to reach us, and the Supreme Court has not yet had a chance to consider it. This case therefore satisfies the "evading review" portion of the "capable of repetition, yet evading review" doctrine.

[4] Second, this case also satisfies the "capable of repetition" requirement. The defendants have not met their burden to show that there is no reasonable expectation that the plaintiffs will be subjected to a PSA again. *See Ackley v. W. Conference of Teamsters*, 958 F.2d 1463, 1469 (9th Cir. 1992) ("It is the defendant, not the plaintiff, who must demonstrate that the alleged wrong will not recur."). In support of its claim that it will never enter into a PSA again, the District offers only a declaration by its Vice Chancellor attesting that seventy-five percent of Measure E funds have been expended, that the remaining funds have been committed to projects that cannot be completed because of insufficient funds, that the District does not anticipate entering into a new PSA due to "present economic conditions," and that the passage of Measure E was "unprecedented" and, in his opinion, a "once in a lifetime event."[3] This declaration does not adequately demonstrate that

---

[3]The defendants moved to supplement the record on appeal to include a declaration attesting to these facts, which were not before the district court. Although the court denied the motion in a clerk's order, we reconsider that decision sua sponte and grant the motion. Because the new facts that the defendants seek to establish bear on whether the controversy before us is moot, we exercise our discretion to supplement the record on appeal so that we may determine whether we have jurisdiction over the ERISA and NLRA claims for declaratory and injunctive relief. *See Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003) (explaining that we may supplement the record on appeal where "developments [might] render a controversy moot and thus divest us of jurisdiction").

the District will not enter into a PSA again. Indeed, twenty-five percent of Measure E funds remain, and it would be unreasonable to assume that the District will never use those funds just because they currently lack sufficient funding to complete the projects to which those funds have been committed. Moreover, the Vice Chancellor's assertion that the District does not anticipate entering into a new PSA "[b]ecause of present economic conditions" implies that it may resume construction, and accordingly enter into a new PSA, once the economic situation improves.

[5] Because the District has not shown that it will not enter into another PSA in the future, and because the duration of the PSA is too short to allow for full judicial review, the expiration of the PSA does not render the plaintiffs' claims for declaratory and injunctive relief moot.

## 2.  Graduation of the Named Apprentices

We next consider whether the fact that the individual apprentices have graduated from their apprenticeship programs renders the ERISA and NLRA preemption claims moot as to them. At the outset, however, we note that whether the apprentices remain in this suit will not affect our analysis of the preemption issues or any relief we grant or deny. The plaintiff apprenticeship committees' claims of ERISA and NLRA preemption are identical to the individual apprentices' claims, and the apprentices' identities and particular circumstances are irrelevant to our analysis.

[6] A case is moot when the "parties lack a legally cognizable interest in the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). The apprentices retain a cognizable interest in the outcome of their NLRA preemption claim because that claim does not depend on their status as apprentices. The plaintiffs contend that sections 7 and 8 of the NLRA preempt the PSA under *San Diego Build-*

*ing Trades Council v. Garmon,* 359 U.S. 236 (1959). Sections 7 and 8 protect all employees, not just apprentices. *See* 29 U.S.C. §§ 157, 158 (NLRA §§ 7, 8). Because the named apprentices continue to work in the construction industry, they continue to enjoy the NLRA's protections and continue to have a cognizable interest in whether the NLRA preempts the PSA. Their NLRA preemption claim therefore is not moot as to them.

[7] The individual apprentices' ERISA preemption claim, by contrast, does depend on their status as apprentices. They therefore lack a cognizable interest in the outcome of that claim, and the claim is accordingly moot as to them, unless their claim falls within the "capable of repetition, yet evading review" exception to mootness. To establish that their claim falls within that exception, however, the plaintiffs must demonstrate that there is a "reasonable expectation" that they will be subject to a PSA again in their capacity as apprentices. *See Murphy v. Hunt,* 455 U.S. 478, 482 (1982) (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149 (1975)). While the defendants have the burden to show they will not engage in the challenged conduct again, the plaintiffs have the burden to show that they will be subject to the complained-of conduct in the future. *See Sample v. Johnson,* 771 F.2d 1335, 1342 (9th Cir. 1985). The plaintiffs have not met that burden. They do not allege that they intend to go through another apprenticeship program for another craft, but only that they "may" do so. Because this alleged possibility does not demonstrate a "reasonable expectation" that they will be subject to a PSA as apprentices again, we conclude that the named apprentices' ERISA preemption claim does not fall within the "capable of repetition, yet evading review" exception to mootness, and we accordingly dismiss that claim as to them.

**B.   Sovereign Immunity**

The District contends that the Eleventh Amendment entitles it to sovereign immunity from the plaintiffs' claims seeking

nominal damages. We conclude that the District has waived its sovereign immunity and therefore reject its Eleventh Amendment defense.[4]

[8] A state waives its Eleventh Amendment immunity if it "unequivocally evidence[s its] intention to subject itself to the jurisdiction of the federal court." *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 758 (9th Cir. 1999). A state may waive its sovereign immunity through "conduct that is incompatible with an intent to preserve that immunity." *Id.* We have found that state defendants engaged in conduct "incompatible with" an intent to preserve sovereign immunity when they raised a sovereign immunity defense only belatedly, after extensive proceedings on the merits. For example, in *Hill*, we determined that the state waived sovereign immunity when the state did not raise the defense until the opening day of trial, after it had filed two motions to dismiss and an answer that did not assert the defense, consented to have a magistrate judge try the case, conducted discovery, moved to compel discovery and for sanctions, participated in a pre-trial conference, and filed trial materials. *Id.* at 756. Similarly, in *In re Bliemeister*, 296 F.3d 858 (9th Cir. 2002), we found that the state waived immunity when it filed a limited response, an answer, and a motion for summary judgment; attended an oral hearing and argued the merits; and heard the court announce its preliminary leanings, all without raising the sovereign immunity defense. *Id.* at 862.

[9] Like the defendants in *Hill* and *Bliemeister*, the District engaged in extensive proceedings in the district court without seeking dismissal on sovereign immunity grounds. Although it baldly asserted in its Answer that it was "immune from liability pursuant to the provisions of the Eleventh Amendment

---

[4]Absent a waiver, the District would be entitled to sovereign immunity because California community college districts constitute arms of the state entitled to sovereign immunity under the Eleventh Amendment. *See Cerrato v. S.F. Cmty. Coll. Dist.*, 26 F.3d 968, 972 (9th Cir. 1994).

of the United States Constitution," the District litigated the suit on the merits, participated in discovery, and filed a motion to dismiss and a summary judgment motion without pressing a sovereign immunity defense. Although the District asserted its sovereign immunity in its opposition to the plaintiffs' application to file an amended complaint to include a prayer for nominal damages, it did not assert a sovereign immunity defense in the summary judgment briefing filed after the plaintiffs amended their complaint.[5] In circumstances like these, we deem the defendant to have made a tactical decision to delay asserting the sovereign immunity defense. *See Bliemeister*, 296 F.3d at 862. Such tactical delay "undermines the integrity of the judicial system[,] . . . wastes judicial resources, burdens jurors and witnesses, and imposes substantial costs upon the litigants." *Hill*, 179 F.3d at 756. Having chosen "to defend on the merits in federal court," the District will "be held to that choice." *See id.* at 758. We accordingly hold that the District has waived its sovereign immunity defense.

## C.   Merits

Having concluded that this appeal is not moot, and that the District has waived its sovereign immunity, we proceed to consider the merits of the plaintiffs' claims.

---

[5]The District contends that it was "not required" to raise its Eleventh Amendment defense until the plaintiffs sought retrospective damages relief, and that the proceedings on the merits before the plaintiffs sought that relief therefore were not inconsistent with an intent to preserve its sovereign immunity. This argument appears to stem from an erroneous belief that the District could not have asserted immunity from the plaintiffs' claims for prospective relief. Although state *officers* sued in their official capacities are immune only from suits for retrospective relief, *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003) (explaining the doctrine of *Ex parte Young*, 209 U.S. 123 (1908)), state *entities* are immune from suit "regardless of the nature of the relief sought," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). As a state entity, the District thus could and should have asserted sovereign immunity before the plaintiffs amended their complaint to request nominal damages.

## I.   ERISA and NLRA Preemption Claims

[10]  Whether federal law preempts a particular state action is fundamentally a question of congressional intent. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039-40 (9th Cir. 2007). Federal law will preempt state laws that "interfere with, or are contrary to, federal law" only if "that was the clear and manifest purpose of Congress." *Id.* at 1039-40 (internal quotations and citation omitted). The so-called "market participant doctrine" offers us a presumption about Congress's purposes. In general, Congress intends to preempt only state regulation, and not actions a state takes as a market participant. *See Bldg. & Constr. Trades Council v. Associated Builders and Contractors of Mass./R.I., Inc.* ("*Boston Harbor*"), 507 U.S. 218, 227 (1993); *Engine Mfrs.*, 498 F.3d at 1042. This doctrine applies to claims of NLRA and ERISA preemption. *See Boston Harbor*, 507 U.S. at 227 (NLRA); *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.* ("*MWD*"), 159 F.3d 1178, 1182 (9th Cir. 1998) (ERISA). In assessing the plaintiffs' preemption claims, we therefore must first determine whether the District acted as a regulator or as a market participant when it entered into the PSA. Because we conclude that the District acted as a market participant, the plaintiffs' ERISA and NLRA preemption claims fail at the threshold.[6]

[11]  In general, state action falls within the market participant exception to preemption when the state entity directly participates in the market by purchasing goods or services. *See Engine Mfrs.*, 498 F.3d at 1040 (describing the "single inquiry" in market participant cases as "whether the challenged program constituted direct state participation in the market"). But the line between non-preempted market participation and preempted regulation is not always so clear, and a state's direct participation in the market will not always

[6]We therefore need not decide whether the NLRA or ERISA would preempt the PSA if it were regulation.

escape preemption. If a state's direct participation in the market is "tantamount to regulation," the market participant doctrine will not exempt the state's action from preemption. *Wis. Dep't of Indus., Labor & Human Relations v. Gould*, 475 U.S. 282, 289 (1986). Thus, in *Gould*, the Supreme Court held that the NLRA preempted a state law forbidding state procurement agents from using state funds to do business with companies that had repeatedly violated the NLRA, even though the law constrained only the state's own participation in the market. *Id.* at 283-84, 287. The Court explained that the state law "on its face . . . serves plainly as a means of enforcing the NLRA," and that "[n]o other purpose could credibly be ascribed." *Id.* at 287. Because the law imposed a "supplemental sanction" on NLRA violations, it contravened Congress's intent to bar states from "providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Id.* at 286-89 (describing the preemption rule of *Garmon*, 359 U.S. 236).

**[12]** In light of *Gould*, to determine whether a state entity's direct participation in the market falls within the market participant exception to preemption, we must determine whether the state action is simply proprietary or "tantamount to regulation." As a guide to making this determination, we have adopted the two-prong test that the Fifth Circuit established in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999). *See Engine Mfrs.*, 498 F.3d at 1041; *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 881 (9th Cir. 2006). The *Cardinal Towing* test offers two questions to help determine whether state action constitutes market participation not subject to preemption:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference

that its primary goal was to encourage a general pol-
icy rather than address a specific proprietary prob-
lem?

*Id.* As the Fifth Circuit explained, these questions "seek to
isolate a class of government interactions with the market that
are so narrowly focused, and so in keeping with the ordinary
behavior of private parties, that a regulatory impulse can be
safely ruled out." *Id.*

[13] In applying this test, we have not yet conclusively set-
tled whether a state action must satisfy both prongs, or only
one, to qualify as market participation exempt from preemp-
tion. We held in *Lockyer* that "a state need not satisfy both
questions," but we subsequently vacated that opinion after the
Supreme Court reversed it on other grounds. *See Chamber of
Commerce v. Lockyer*, 463 F.3d 1076, 1084 (9th Cir. 2006)
(en banc), *rev'd on other grounds sub nom. Chamber of Com-
merce v. Brown*, 128 S. Ct. 2408 (2008) and *vacated by* 543
F.3d 1117 (2008). Although we are not bound by our vacated
decision in *Lockyer*, we find its reasoning persuasive and
accordingly hold that a state action need only satisfy one of
the two *Cardinal Towing* prongs to qualify as market partici-
pation not subject to preemption. As we pointed out in *Lock-
yer*, the first *Cardinal Towing* question "looks to the *nature*
of the expenditure" and "protects comprehensive state poli-
cies with wide application from preemption, so long as the
type of state action is essentially proprietary." *Id.* at 1084
(emphasis added). The second question looks to the "*scope* of
the expenditure" and "protects narrow spending decisions that
do not necessarily reflect a state's interest in the efficient pro-
curement of goods or services, but that also lack the effect of
broader social regulation." *Id.* (emphasis added). The *Cardi-
nal Towing* test thus offers two alternative ways to show that
a state action constitutes non-regulatory market participation:
(1) a state can affirmatively show that its action is proprietary
by showing that the challenged conduct reflects its interest in
efficiently procuring goods or services, or (2) it can prove a

negative—that the action is *not* regulatory—by pointing to the narrow scope of the challenged action. We see no reason to require a state to show both that its action *is* proprietary and that the action is *not* regulatory.

In any event, we conclude that the PSA challenged here satisfies both prongs of the *Cardinal Towing* test and accordingly is not subject to preemption by the NLRA and ERISA.

a.   *Efficient procurement of goods and services, as measured by comparison to private market behavior*

The plaintiffs contend that the PSA does not meet the first *Cardinal Towing* prong both because it does not reflect the District's interest in "efficient procurement" of goods and services and because it is not comparable to private market behavior. In particular, they first contend that a state entity can have no interest in "efficient procurement" when it spends federal funds and that the Agreement as a whole simply pays off political supporters without actually providing the District with any benefits in terms of "efficient procurement." Second, they contend that no private party would have entered into an agreement providing so few benefits and that no private party in the District's position could have lawfully entered into such an agreement.

These contentions rely on too narrow an understanding of what counts as an interest in "efficient procurement" and of how similar a challenged state action must be to private market behavior to qualify as non-preempted market participation under *Cardinal Towing*'s first prong. Even if the plaintiffs' contentions were true, they would not render the District's direct participation in the market essentially regulatory. Under a proper understanding of *Cardinal Towing*'s first prong, we conclude that the PSA reflects the District's interest in the efficient procurement of goods and services, as measured by comparison to typical private market behavior.

*i.   Efficient procurement*

   **[14]** At the outset, we reject the plaintiffs' suggestion that
the PSA cannot reflect the District's interest in "efficient pro-
curement" to the extent it applies to a construction project
funded in part by federal monies. In support of this conten-
tion, the plaintiffs point to the Second Circuit's decision in
*Healthcare Association of New York State, Inc. v. Pataki*, 471
F.3d 87 (2d Cir. 2006), which held that a state regulation bar-
ring the use of state-appropriated funds to encourage or dis-
courage union organizing was preempted to the extent it
applied to federal funds that merely passed through the state.
*Id.* at 90-91, 109. Contrary to the plaintiffs' reading, however,
*Pataki* does not suggest that a state can never have a propri-
etary interest in the efficient procurement of goods and ser-
vices when it uses federal money. Rather, *Pataki* holds that,
although a state has a proprietary interest in "sav[ing] money"
and "getting what [it] paid for" with its own funds, it does not
have a similar interest in saving another government entity's
money. *Id.* at 109. Here, the District does not claim a propri-
etary interest in "getting what [it] paid for," but rather in com-
pleting construction projects without labor disruptions. We
have no doubt that this is a legitimate interest in "efficient
procurement" whether the state agency expends its own funds
or funds that the federal government has given it.

   The plaintiffs further contend that the PSA does not
advance an interest in efficient procurement because it pre-
sents several downside risks while offering no benefits in
terms of costs, labor availability, or timeliness for the con-
struction. Whether the PSA's benefits outweighed its costs,
however, bears only on whether the District made a good
business decision, not on whether it was pursuing regulatory,
as opposed to proprietary, goals. We must keep in mind that
congressional intent is the touchstone of our preemption anal-
ysis, *Engine Mfrs.*, 498 F.3d at 1040, and we have no reason
to think that Congress intended to allow beneficial state con-

tracts while preempting similar contracts in which the state
got a bad deal.

Moreover, we have made clear that "efficient procurement"
under *Cardinal Towing*'s first prong does not necessarily
mean "cheap" procurement, but rather "procurement that
serves the state's purposes." *Engine Mfrs.*, 498 F.3d at 1046.
Thus, in *Engine Manufacturers*, we upheld as lawful market
participation a state rule requiring state and local government
entities to ensure that any new street sweepers, garbage
trucks, and other vehicles that they procured met specified
emissions standards. *Id.* at 1035, 1048. Even though the state
entity pursued environmental, as opposed to economic, goals
through its participation in the market, the market participant
doctrine still applied.

*Gould*, however, necessarily places limits on what can
qualify as an interest in "efficient procurement" under *Cardi-
nal Towing*'s first prong. Although "efficient procurement"
means "procurement that serves the state's purposes," *id.*,
pursuit of some purposes will make a state's participation in
the market "tantamount to regulation." *Gould*, 475 U.S. at
289. In *Gould*, the state enacted a statute forbidding govern-
ment procurement agencies from doing any business with
labor law violators. *Id.* at 283-84. Despite the state's assertion
that it was acting as a market participant, the Supreme Court
concluded that the law "unambiguously" acted as a "supple-
mental sanction" for violations of the NLRA, and was pre-
empted. *Id.* at 288. *Gould* establishes that, where the state
seeks to affect private parties' conduct unrelated to the perfor-
mance of contractual obligations to the state, the state's direct
participation in the market does not reflect its interest in "effi-
cient procurement" of goods and services. *See id.* at 189
(explaining that "[i]t is the conduct being regulated . . . that
is the proper focus of concern" (internal quotations and cita-
tion omitted)); *see also Boston Harbor*, 507 U.S. 228-29
(describing the statute in *Gould* as "address[ing] employer
conduct unrelated to the employer's performance of contrac-

tual obligations to the state"); *see also Bldg. and Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 36 (D.C. Cir. 2002) ("A condition that the Government imposes in awarding a contract or in funding a project is regulatory only when, as the Supreme Court explained in *Boston Harbor*, it 'addresse[s] employer conduct unrelated to the employer's performance of contractual obligations to the [Government].' " (alterations in original) (quoting *Boston Harbor*, 507 U.S. at 228-29)).

**[15]** Unlike the regulation in *Gould*, nothing on the face of the PSA indicates that it serves purely regulatory purposes unrelated to the performance of contractual obligations to the state. The PSA does not reward or sanction private parties for their conduct in the private market, but rather addresses only how construction contractors and subcontractors will perform work on the District's projects. Plaintiffs contend that the PSA's primary purpose was to reward the unions that supported the Measure E campaign. Yet, the District intended for the PSA to serve legitimate proprietary goals, including containing costs, optimizing productivity, and boosting the economy. Private parties undertaking large construction projects commonly enter into pre-hire project labor agreements like the PSA challenged here. Whether or not plaintiffs are correct that the District had ulterior motives in adopting the PSA, we are quite certain that Congress did not intend for the NLRA's or ERISA's preemptive scope to turn on state officials' subjective reasons for adopting a regulation or agreement. *Cf. N. Ill. Chapter of Associated Builders and Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005) ("Federal preemption doctrine evaluates what legislation *does*, not why legislators voted for it or what political coalition led to its enactment." (emphasis in original)).

*ii. Comparison to private market behavior*

The plaintiffs next contend that the PSA cannot satisfy *Cardinal Towing*'s first prong because it is not sufficiently

comparable to private market behavior. In particular, they
contend that no private party would have entered into a proj-
ect labor agreement providing so few benefits and that no pri-
vate party in the District's position could have lawfully
entered into such an agreement. However, even if true, those
considerations would not preclude the PSA from being suffi-
ciently analogous to private market behavior to satisfy *Cardi-
nal Towing*'s first prong.

First, the plaintiffs' contention that no private party would
have entered into a deal with so few benefits again reflects its
misunderstanding that Congress intended to allow state mar-
ket participation to escape preemption only where the state
gets a good deal. As explained above, whether the PSA was
a good deal for the District does not bear on whether the
Agreement is regulatory or proprietary. Indeed, we cannot
credibly ascribe to Congress an intent to use preemption to
impose economic rationality on state contracting decisions.

Second, the plaintiffs also miss the mark in contending that
a private purchaser in the District's position could not have
lawfully entered into the PSA because the NLRA bars such
pre-hire agreements unless the contracting party is an "em-
ployer engaged primarily in the building and construction
industry," which a school district is not.[7] *See* 29 U.S.C.
§ 158(f). This provision of the NLRA does not mean that the
District's entry into the PSA is not market participation; it
simply means that the District can participate in the market in
a way in which private parties cannot. The NLRA itself
creates this disparity by explicitly excluding states and their
political subdivisions from the NLRA's prohibitions. *See id.*
§ 152(2) ("the term 'employer' . . . shall not include . . . any
State or political subdivision thereof"); § 158(a) (providing

---

[7]The parties dispute whether a private owner-developer could lawfully
enter into an agreement like the PSA here. Because we conclude that the
legality of analogous private party conduct is not relevant to the question
before us, we need not resolve this dispute.

that "[i]t shall be an unfair labor practice for *an employer*" to engage in certain enumerated actions (emphasis added)). Were we to hold, as the plaintiffs urge, that a state's direct participation in the market becomes "regulation" subject to preemption whenever a private party could not lawfully participate in the market in the same way, we would effectively subject state employers to the NLRA's proscriptions. This would conflict with the clear congressional intent to exempt state employers from the NLRA's reach.

Contrary to the plaintiffs' suggestion, the Supreme Court's statement in *Boston Harbor* that Congress does not preempt state proprietary action "where analogous private conduct would be permitted" does not suggest otherwise. *See Boston Harbor*, 507 U.S. at 231-32. In *Boston Harbor*, the Court upheld as lawful market participation a state agency's requirement that all contractors working on the cleanup of Boston Harbor agree to a project labor agreement that the agency's construction management company had negotiated with a labor union. *Id.* at 221-22, 232. The agreement in *Boston Harbor*, unlike the PSA here, fell squarely within NLRA provisions exempting construction industry employers from the prohibition of pre-hire agreements because the state agency's project management company, rather than the agency itself, entered into the agreement with the union. *Id.* at 221-22. But the Court in no way suggested that the fact that the project manager, rather than the agency, entered into the agreement was dispositive. To the contrary, the basis for the Court's holding was Congress's clear intent to "accommodate conditions specific to [the construction] industry," including the short-term nature of employment that impeded post-hire collective bargaining and the contractor's need for predictable costs and a steady labor supply. *Id.* at 231. In light of the "general goals behind the passage of [these provisions]," the Court concluded that Congress did not intend to preempt state entities from adopting such agreements for state construction projects, while allowing such agreements in the construction industry generally. *Id.* at 231-32.

Indeed, the identity of the parties who signed the project labor agreement in *Boston Harbor* only formally distinguishes that agreement from the PSA here. The agreements' practical effects are the same. Here, as in *Boston Harbor*, a pre-hire agreement binds all contractors and subcontractors working on covered projects. Moreover, the agency in *Boston Harbor* "approved and adopted" the labor agreement, which the project manager had entered into "on [the agency's] behalf," and, like the District, required all bidders to submit to the agreement as a condition of accepting work on the project. *Id.* at 222. *Boston Harbor* makes clear that congressional intent controls our preemption analysis, *see id.* at 224, 231, and we find no indication in the NLRA that Congress intended to allow state entities to adopt project labor agreements only if they use a construction-industry middleman exempt from the NLRA's proscriptions.

[16] In sum, we hold that the District's PSA reflects its interest in the efficient procurement of goods and services, as measured by comparison to typical private market behavior. It therefore qualifies as market participation exempt from preemption under *Cardinal Towing*'s first prong.

*b. Narrow scope*

We further conclude that the PSA challenged here is sufficiently narrow in scope that it qualifies as non-preempted market participation under *Cardinal Towing*'s second prong.

Despite covering many individual construction projects, the PSA limited its reach to construction projects costing over $200,000 that were paid for with the $337 million of Measure E funds and that were initiated during the three-year term of the agreement. This is undoubtedly narrower than the agreement approved in *Boston Harbor*, which covered $6.1 billion of spending over ten years. *Id.* at 221. Although the agreement approved in *Boston Harbor* covered the "one particular job" of cleaning up Boston Harbor, that one job almost cer-

tainly could have been characterized as many component projects. *Boston Harbor*, 507 U.S. at 232. Likewise, here, the PSA could be characterized as covering the single project of improving campus facilities.

Moreover, the PSA's substantive scope is very similar to the *Boston Harbor* agreement's. *See id.* at 232. Like the District's PSA, the *Boston Harbor* agreement recognized one exclusive bargaining agent, specified dispute-resolution mechanisms, required all employees to become union members within seven days of their employment, required use of the union's hiring halls to supply the labor force, prohibited strikes for the term of the agreement, bound all contractors and subcontractors to the agreement, and prescribed the benefits that workers would receive for the duration of the project. *Id.* at 221-22; *see also* Brief for Petitioners at 7, *Boston Harbor*, 507 U.S. 218 (1993) (No. 91-261), 1992 WL 511837.

[17] The District's Agreement does, however, contain one set of provisions that the *Boston Harbor* agreement did not appear to have: provisions requiring the parties to maximize work opportunities for the District's residents and for minority- and women-owned businesses. Specifically, the Agreement required signatory unions to establish apprenticeship programs for District residents, to encourage District residents to enter those programs, and to encourage the utilization of District residents on the projects covered by the PSA. These provisions do not render the PSA too broad to qualify as market participation under *Cardinal Towing*'s "narrow scope" test; they are simply part of the consideration that the unions provided in exchange for the benefits they received under the Agreement. This conclusion accords with the Supreme Court's decision in *White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204 (1983), that a city acted as a market participant not subject to the dormant Commerce Clause when it adopted an executive order requiring that certain percentages of workers on city-funded public

construction projects be city residents, minorities, and women. *Id.* at 206, 214.

[18] We therefore conclude that the District's PSA is sufficiently narrow to qualify as market participation exempt from preemption under *Cardinal Towing*'s second prong. Because entering into the PSA qualifies as market participation—under both prongs of the *Cardinal Towing* test—it is not subject to preemption by ERISA or the NLRA. We accordingly affirm the grant of summary judgment for the defendants on the preemption claims.

## 2.  *Substantive and Procedural Due Process Claims*

The plaintiffs contend that the PSA violated their rights to substantive and procedural due process by depriving them of liberty and property interests protected by the Fourteenth Amendment. To succeed on a substantive or procedural due process claim, the plaintiffs must first establish that they were deprived of an interest protected by the Due Process Clause. *See Shanks v. Dressely*, 540 F.3d 1082, 1087 (9th Cir. 2008) (substantive due process); *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003) (procedural due process). We conclude that the plaintiffs cannot make this threshold showing and accordingly affirm the grant of summary judgment to the defendants on the due process claims.

### a.  *Claimed Liberty Interest*

[19] The plaintiffs first contend that the PSA deprived them of their protected liberty interest in pursuing careers as electricians by "categorically disqualif[ying] them and render-[ing] them ineligible for virtually any Rancho Santiago construction work for three years." The Due Process Clause does indeed protect the plaintiffs' liberty interest in pursuing their careers as electricians. *See Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972) (holding that the Due Process Clause protects

the right to "engage in the common occupations of life"). The PSA, however, did not deprive the plaintiffs of that interest.

[20] The Supreme Court made clear in *Board of Regents v. Roth* that merely declining to rehire someone does not infringe on his liberty interest in pursuing a career because the person "remains free as before to seek another" job. *Id.* at 575. Rather, the government violates this liberty interest only when it "foreclose[s the person's] freedom to take advantage of other employment opportunities," for instance by barring him or her from "all other public employment." *Id.* at 573-74. By extension, then, declining to hire someone in the first instance does not infringe any protected liberty interest so long as the decision does not bar the person from all public employment or otherwise foreclose him from seeking other job opportunities.

[21] The plaintiffs contend that the PSA violated their liberty by effectively barring them from working on a significant portion of the District's construction projects for three years. This contention fails for two reasons. First, the plaintiffs were not excluded from all public employment on the District's projects; they still had the opportunity to work on non-Measure E-funded projects and on Measure E projects costing less than $200,000. Second, and more importantly, the plaintiffs were not actually excluded from working on the projects covered by the PSA: the non-union apprentices remained free to join a union apprenticeship program qualified to provide workers for those projects. The PSA therefore did not violate the plaintiffs' liberty interest in pursuing their careers as electricians.

### b.   Claimed Property Interests

The plaintiffs also contend that the PSA deprived them of three protected property interests: (1) their interest in remaining eligible to work on the District's construction projects, (2) their interest in a state-funded education, and (3) their interest

in the credits, job hours, and training they had earned through their non-union apprenticeship programs. We conclude that the PSA did not deprive the plaintiffs of any such protected property interests.

First, the plaintiffs have not even made the threshold showing that the Due Process Clause protects their interest in remaining eligible to work on the District's construction projects. Protected property interests "are not created by the Constitution[, but r]ather . . . they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577. State law creates a property interest protected by the Due Process Clause where it creates a "legitimate claim of entitlement" to a particular benefit. *Id.* A legitimate claim of entitlement "is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." *Wedges/Ledges of Cal., Inc. v. Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994) (quoting *Ass'n of Orange Co. Deputy Sheriffs v. Gates*, 716 F.2d 733, 734 (9th Cir. 1983)). Although the plaintiffs contend, without explanation, that the "net effect" of a variety of California laws confers on them an entitlement to remain eligible for work on the District's projects, they point to no law that even comes close to mandating that non-union apprentices remain eligible for all construction projects. We therefore conclude that the plaintiffs have no protected property interest in remaining eligible to work on the District's projects.

Second, even if California law confers a protected property interest in a state-funded education, the plaintiffs do not explain how the PSA deprived them of that interest. Indeed, the plaintiffs clearly could not show that they suffered a deprivation of their purported right to an education, as they have all graduated. We accordingly reject this claim.

Third, even if California law creates protected property interests in the credits, job hours, and training that the named

apprentices earned through their non-union apprenticeship programs, the PSA did not deprive them of those interests. The PSA did not kick the plaintiffs out of their apprenticeship programs or strip them of their credits and training hours. At most, the PSA required the plaintiffs to put some of their credits and training hours in jeopardy if they chose to transfer to another apprenticeship program so that they could work on PSA-covered projects. This loss would have resulted from the apprentices' choice to transfer programs, not from the PSA itself.

[22] In sum, the PSA did not deprive the plaintiffs of any liberty or property interest protected by the Due Process Clause. We accordingly affirm the grant of summary judgment to the defendants on the plaintiffs' due process claims.

## 3.  *Equal Protection Claim*

Finally, the plaintiffs contend that the PSA violated their rights to equal protection because it treated them differently than union-affiliated apprentices. The parties agree, as they must, that rational basis scrutiny applies to this claim.[8] *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (explaining that rational basis scrutiny applies to equal protection claims "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage"). State action will survive rational basis scrutiny if it is "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Under rational basis review, the state actor "has no obligation to produce evidence to sus-

---

[8]The District contends that the PSA does not constitute state action subject to the Equal Protection Clause because it constitutes market participation, not regulation. The market participation doctrine, however, applies only to the Commerce Clause and preemption. *See Engine Mfrs.*, 498 F.3d at 1040. The District offers no authority suggesting that states need not abide by the Equal Protection Clause when they are acting as market participants.

tain the rationality of a statutory classification; rather, the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1280 (9th Cir. 2004) (internal quotations, alteration, and citation omitted).

The plaintiffs have not met this burden. The plaintiffs contend that the PSA fails the rational basis test because it was not rationally related to the District's claimed legitimate interest in avoiding labor disruptions. In support of this contention, they point to evidence that the District did not analyze the PSA's "true cost impact." This contention misses the mark. First, the Equal Protection Clause "allows the States wide latitude" with economic decisions, and "presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440 (internal citations omitted). Thus, even if the District's purported failure to fully analyze the PSA's costs resulted in an improvident decision, the Equal Protection Clause will not invalidate it. Second, to survive rational basis scrutiny, a state action need not *actually* further a legitimate interest; it is enough that the governing body "*could have rationally decided* that" the action would further that interest. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (emphasis in original). Here, even if the PSA did cost the District more than it was worth, the District could have rationally believed that the PSA would promote its legitimate interest in avoiding labor disruptions. Indeed, the PSA plainly contains provisions that serve that goal by prohibiting work stoppages, strikes, and other disruptions.

[23] Because we conclude that the PSA was rationally related to the District's legitimate interest in preventing labor disruptions, we affirm the grant of summary judgment to the defendants on the plaintiffs' Equal Protection Claim.

## IV.  CONCLUSION

In sum, we conclude that this appeal is not moot and that the District has waived any claim to sovereign immunity.

JOHNSON V. RANCHO SANTIAGO COMMUNITY COLLEGE   17001

Because we conclude that the PSA falls within the market participant exception to preemption, we affirm the grant of summary judgment to the defendants on the ERISA and NLRA preemption claims. We also affirm the grant of summary judgment to the defendants on the plaintiffs' substantive and procedural due process claims because the plaintiffs have not shown that the District deprived them of any constitutionally protected liberty or property interest. Finally, we conclude that the PSA was rationally related to the District's legitimate interest in avoiding labor disruptions and accordingly affirm the grant of summary judgment to the defendants on the Equal Protection claim.

**DISMISSED in part; AFFIRMED in part.**